IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 8, 2021 Session

## KACY COLLUMS DAVIS v. RICHARD E. DAVIS, JR.

**Appeal from the Circuit Court for Shelby County**
**CT-002506-13     Rhynette N. Hurd, Judge**

_____

### No. W2019-02245-COA-R3-CV

_____

In this divorce case, Richard E. Davis, Jr. ("Husband") challenges the trial court's division of the marital estate, the award of spousal support and attorney's fees to Kacy Collums Davis ("Wife"), and the trial court's designation of Wife as primary residential parent. Wife asserts that the trial court erred in its division of the marital estate, in declining to award her 100% of her attorney's fees, in denying her motion to disqualify the guardian ad litem, in awarding the parties equal parenting time, and in calculating Husband's income for child support purposes. We modify the division of the marital estate (1) to correct a miscalculation, agreed by the parties to have been a clerical error in the trial court's order, counting Wife's retirement account twice; and (2) to reflect that Wife shall be responsible for the debt for her first attorney's fees, which is secured by a lien on the marital residence. We affirm the trial court's judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed as Modified; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and CARMA DENNIS MCGEE, J., joined.

Lara E. Butler and Elizabeth W. Fyke, Memphis, Tennessee, for the appellant, Richard E. Davis, Jr.

Stevan L. Black, Vickie Hardy Jones, and Holly J. Renken, Memphis, Tennessee, for the appellee, Kacy Collums Davis.

## OPINION

### I. BACKGROUND

The parties were married in 2003. They have five children, the eldest three of whom were born to Mother and her first husband and adopted by Father after the marriage. These three children had reached adulthood by the time of the divorce trial, which took place over seven days in late 2018 and February of 2019. The youngest two children were born to the parties during the marriage. The parties separated in January of 2013. Mother filed for divorce in June of 2013. More than six years of highly contentious litigation followed.

According to the trial court's findings of fact,

Wife [went] to great lengths to restrict Husband's parenting time, including accusing Husband of abusing the children, reporting Husband to DCS, and accusing Husband of drinking.

None of Wife's allegations against Husband have been substantiated.

Because of Wife's efforts to limit Husband's parenting time, Husband moved to have the Court appoint a guardian ad litem.

(Numbering in original omitted). The trial court entered a consent order appointing Shari M. Myers as guardian ad litem ("GAL") for the children on April 25, 2014. Over the course of the litigation, Husband filed numerous attempts to exercise and increase his parenting time with the children. As found by the trial court, "Wife does not believe the minor children can have a positive relationship with Husband, and, therefore, has resisted vigorously Husband's efforts for more parenting time." The trial court also found that "[d]uring the course of the proceedings, Wife has filed at least five contempt petitions against Husband" and "[n]one of the contempt petitions have resulted in Husband being found in contempt."

On November 7, 2014, the trial court entered a consent order whereby the "parties agree that for good cause, the children's treating therapist shall be changed to Dr. Catherine Collins," each agreed to abide by the reasonable recommendations of Dr. Collins, and Husband agreed to pay the costs of therapy and treatment.

On December 9, 2014, Wife's first attorney withdrew from her representation and filed an attorney's lien "against all real estate, personal property, future payments . . . and proceeds received by [Wife] in her divorce, for attorney's fees and expenses due and owing pursuant to a contract in the amount of $67,692.69." By the time of trial, interest had accrued on the unpaid fees, bringing the balance for the debt owed for fees to Wife's first attorney to $81,959.77.

In mid-2016, the trial court entered an order for a forensic psychological custodial evaluation of the parents and the two youngest children. The order designates Dr. John Ciocca as "the agreed Forensic Psychological Custodial Evaluator." Dr. Ciocca testified as follows regarding his conclusions:

> I made the determination that both parents were fit, that the children were attached to both parents. The father certainly did not represent a threat of harm to the children, which was one of the original considerations of the case, . . . and that there needed to be substantial time with the father in order to− that their best interest would be served by having substantial time with both of them.

> \* \* \*

> [M]y recommendation was substantially equal time, and ideally it should take the form of alternating weeks of parenting time for each parent throughout the calendar year with adjustments made for routine holidays to be alternated in some reasonable way.

The GAL filed a proposed parenting plan that incorporated the recommendations and conclusions of Drs. Collins and Ciocca on April 18, 2018. The proposed plan provided equal parenting time for the parties, an outcome that Wife continued to vigorously oppose. She filed a motion to disqualify the GAL shortly thereafter, on May 25, 2018. As grounds, Wife argued that Husband entered into a bartering agreement with the GAL whereby he provided landscaping services in lieu of payment for her attorney fees as GAL. Wife did not assert that the bartering payment agreement was improper, but that Husband and/or the GAL should have informed her and the trial court of the agreement. Wife also alleged that the GAL "has a personal relationship with Father" that created a potential conflict of interest. The GAL opposed the motion to disqualify and denied any inappropriate or unprofessional behavior on her part.

The trial court conducted a hearing on the motion to disqualify that lasted three days in July of 2018. The court denied the motion, stating among other things that "it wasn't probably the best idea for this type of bartering to have occurred without the knowledge of the other party, but there is in my view no requirement that the party who is required to pay for the services of the guardian ad litem has to let the other party know how that is being paid." The trial court further found no conflict of interest or improper conduct by the GAL.

Witnesses at trial included the parties, Dr. Ciocca, Dr. Collins, Wife's sister, Wife's first attorney, Husband's brother-in-law, and Husband's accountant. After the conclusion of the trial, the trial court entered a permanent parenting plan order that designated Wife

primary residential parent, and awarded each party 182.5 days parenting time per year with "alternat[ing] uninterrupted week to week parenting time" from Friday to Friday and evenly split holidays. The trial court found Husband's gross monthly income to be $8,659 and Wife's $2,530. Husband was ordered to pay $889 per month in child support, in accordance with the child support guidelines.

Regarding its award of spousal support, the trial court considered the statutory factors provided by Tenn. Code Ann. § 36-5-121 and awarded Wife transitional alimony in the amount of $2,500 per month for five years. The trial court also awarded Wife $7,500 of her attorney's fees as alimony in solido. In dividing the marital estate, the trial court found all of the parties' assets to be marital and awarded Husband property valued at $279,250 (61.3% of the marital assets) and Wife $175,980 (38.7%).[1] The court found the value of the marital residence to be $600,000, encumbered by a mortgage of $317,500. The divorce decree states that "[t]aking into consideration the attorney's lien" filed against the residence by Wife's first attorney, "equity in the marital residence is now approximately $200,500.00."[2] The trial court assigned marital debts totaling $221,123.38 to Husband (82.6% of the total debt), and $46,483.96 to Wife (17.4%). Included in this division of debt was the trial court's holding that "Husband and Wife shall each be responsible for payment of one-half of the balance due to the GAL." The net value of the property awarded to Wife was $129,496.04 (69% of the net marital estate), and to Husband $58,126.62 (31%).

The day after the trial court entered its findings of fact and conclusions of law, Wife's attorney filed a notice of attorney's lien "in the amount of $321,059.17 [that] attaches to all that is, or has been, recovered by or awarded to [Wife], whether the award be alimony, attorney fees, money, division of assets, bank accounts, investment and/or retirement accounts, chattels, realty, or interests or equities in chattels, realty or any other property." Following the trial court's entry of final divorce decree, Husband timely filed a notice of appeal to this Court.

## II. ISSUES PRESENTED

Husband presents the following issues:

---

[1] The parties agree that the trial court's order contains a clerical error in counting Wife's retirement account twice, once valued at $18,230, and once at $18,000. These numbers reflect the corrected calculation, which results in Wife's award being $18,000 less than calculated by the trial court.

[2] As found by the trial court, Wife's first attorney testified that the amount of her lien at time of trial was $81,959.77. The trial court appears to have rounded this number up slightly to $82,000 to reach the exact valuation of $200,500 equity in the residence.

4

1. Whether the trial court erred in its classification and division of assets and debts of the parties.
2. Whether the trial court erred in awarding alimony to Wife.
3. Whether the trial court erred in awarding attorney's fees to Wife rather than Husband, and in its allocation of responsibility to pay the GAL's fees.
4. Whether the trial court erred by designating Wife the primary residential parent.

Wife raises the following issues:

1. Whether the trial court erred in its classification and division of the assets and debts of the parties.
2. Whether the trial court erred in awarding Wife transitional alimony of $2,500 per month for sixty months.
3. Whether the trial court erred in refusing to order Husband to pay 100% of Wife's attorney's fees.
4. Whether the trial court erred by awarding equal parenting time to the parties.
5. Whether the trial court erred by denying Wife's motion to disqualify the GAL.
6. Whether the trial court erred in its calculation of Husband's income for child support purposes.
7. Whether Wife should be awarded her attorney's fees on appeal.

### III. ANALYSIS

### A. Classification and Division of Assets and Debts

Each party challenges the trial court's classification and division of assets and debts. Our Supreme Court has defined the applicable standard of review of issues regarding property classification and division in divorce proceedings:

> The classification of particular property as either separate or marital is a question of fact to be determined in light of all relevant circumstances. *See Langford v. Langford*, 220 Tenn. 600, 421 S.W.2d 632, 634 (1967); *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 241 (Tenn. Ct. App. 1995). This Court gives great weight to a trial court's decisions regarding the division of marital assets, and we will not disturb the trial court's ruling unless the distribution lacks proper evidentiary support, misapplies statutory requirements or procedures, or results in some error of law. *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007). As to the trial court's findings of fact, "we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary." *Id.* However, we accord no presumption of correctness to the

5

trial court's conclusions of law.  *Id.*

*Snodgrass v. Snodgrass*, 295 S.W.3d 240, 245-46 (Tenn. 2009).

After classifying and valuing marital property, a trial court must equitably divide it between the parties.  *See* Tenn. Code Ann. § 36-4-121(a)(1); *Luplow v. Luplow*, 450 S.W.3d 105, 109 (Tenn. Ct. App. 2014) (citing *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001)).  An equitable division of marital property does not require that the property be divided equally.  *Id.* at 109-10 (citing *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002)).  Nor does it require that each party receive a share of every item classified as marital property.  *Morton v. Morton*, 182 S.W.3d 821, 833-34 (Tenn. Ct. App. 2005) (quoting *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998)).  According to Tenn. Code Ann. § 36-4-121(c),

> In making equitable division of marital property, the court shall consider all relevant factors including:
>
> (1) The duration of the marriage;
> (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
> (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
> (4) The relative ability of each party for future acquisitions of capital assets and income;
> (5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
>> (B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.
> (6) The value of the separate property of each party;
> (7) The estate of each party at the time of the marriage;
> (8) The economic circumstances of each party at the time the division of property is to become effective;
> (9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses

6

associated with the asset;

(10) In determining the value of an interest in a closely held business or similar asset, all relevant evidence, including valuation methods typically used with regard to such assets without regard to whether the sale of the asset is reasonably foreseeable. . . .

(11) The amount of social security benefits available to each spouse; and

(12) Such other factors as are necessary to consider the equities between the parties.

The trial court has broad discretion in devising an equitable division of marital property. *Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003). This Court will not overturn the trial court's determination unless "it is inconsistent with the statutory factors or lacks proper evidentiary support." *Trezevant v. Trezevant*, 568 S.W.3d 595, 607 (Tenn. Ct. App. 2018) (citing *Baggett v. Baggett*, 422 S.W.3d 537, 543 (Tenn. Ct. App. 2013)).

Husband appeals the trial court's ruling regarding a single asset−a 1978 Toyota Landcruiser. The parties agree that he owned it prior to the marriage. During the course of the marriage, Husband worked on restoring the Landcruiser, expending marital funds to do so. Tenn. Code Ann. § 36-4-121(b)(1)(B)(i) provides that "'[m]arital property' includes income from, and any increase in the value during the marriage of, property determined to be separate property . . . if each party substantially contributed to its preservation and appreciation." As with nearly every conceivable issue in contention in this case, the parties' testimony sharply differed on the extent of the renovations to the Landcruiser. Wife testified that it was not completely paid for at the time of the marriage, Husband paid off the remaining debt during the marriage, and Husband "told me he spent around $25,000 restoring it." Husband testified that it was fully paid for before the marriage and that the work he did on it was relatively minor, including new paint, tires, stereo system, and seats. The trial court had the opportunity to see and evaluate this conflicting testimony.

Although the trial court's chart incorporating the specifics of its division describes each party's portion of the Landcruiser's value as "one-half," the order also clarifies and specifies the court's ruling as follows: "Husband [shall] have the restored Landcruiser appraised by a qualified appraiser and shall pay Wife fifty percent of [the] difference between the value before and after the restoration." It thus appears that the trial court's award of the Landcruiser was in accordance with Tenn. Code Ann. § 36-4-121(b)(1)(B)(i), and we do not find error in its decision to divide the amount of the increased value of the vehicle resulting from restoration during the marriage.

The remaining issues present an unusual intersection of the principles governing the division of a marital estate, spousal support, and attorney's fees. Husband argues that the effect of removing the amount of Wife's debt to her first attorney from the equity in the

7

marital residence to be divided was an improper and unwarranted award of attorney's fees to Wife. The specific findings of fact by the trial court on this point are as follows:

> In October 2014, the parties agreed Wife would move out, and Husband would move back into the marital residence and make necessary repairs to place the residence on the market. The parties intended with sale of the marital property, which the parties purchased in 2010 for approximately $410,000.00, that Husband would be reimbursed for his expenses related to repairs, and, after payment of debt on the property and other costs, each party would receive fifty percent of the remaining proceeds.
>
> Before the parties could agree on a real estate agent, the attorney who represented Wife until December 9, 2016, placed a lien against the marital residence, a lien that is currently $81,959.77. The attorney holding the lien agreed to release the lien to allow the house to be sold so long as the proceeds were held with the Court pending resolution of the divorce.
>
> The marital residence has not yet been sold. Using marital funds, Husband made several unanticipated repairs to the residence, including work required in 2017 because of a broken water line that caused significant damage to the marital residence. The marital residence is now valued at approximately $600,000.00. The balance on the mortgage is approximately $317,500.00. Taking into consideration the attorney's lien, equity in the marital residence is now approximately $200,500.00.

(Numbering in original omitted; paragraphs reorganized). The trial court ordered:

> Husband shall be allowed to remain in the marital residence; provided, however, Husband shall within three months of entry of the Final Decree, refinance the marital residence, relieving Wife of all liability and paying Wife fifty percent of the equity, *after payment of the attorney's lien* and any fees related to the refinancing.
>
> If within three months Husband is unable to refinance the marital residence on reasonable terms with a reduction in the monthly mortgage payment, the parties shall place the property on the market for sale with a qualified realtor. Upon the sale of the home, the mortgage, realtor's fees, *attorney's lien*, and customary and ordinary closing costs *shall be paid in full, after which the parties shall equally divide the proceeds*.

(Emphasis added).

The effect of the trial court's judgment in this regard is to make Husband responsible for paying one-half of Wife's $81,959.77 fee for her first attorney. As our Supreme Court has stated,

> It is well-settled that an award of attorney's fees in a divorce case constitutes alimony in solido. *See* Tenn. Code Ann. § 36–5–121(h)(1) ("alimony in solido may include attorney fees, where appropriate"); *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996). . . . As with any alimony award, *in deciding whether to award attorney's fees as alimony in solido, the trial court should consider the factors enumerated in Tennessee Code Annotated section 36–5–121(i)*. A spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses. *Umstot v. Umstot*, 968 S.W.2d 819, 824 (Tenn. Ct. App. 1997). Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses, *see Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992), or the spouse would be required to deplete his or her resources in order to pay them, *see Harwell v. Harwell*, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980). Thus, where the spouse seeking such an award has demonstrated that he or she is financially unable to procure counsel, and where the other spouse has the ability to pay, the court may properly grant an award of attorney's fees as alimony. *See id.* at 185.

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 113 (Tenn. 2011) (emphasis added). This Court has also held that in making an award of attorney's fees as alimony in solido, "a court must carefully consider the relevant factors set forth in Tenn. Code Ann. § 36-5-121(i)." *Yattoni-Prestwood v. Prestwood*, 397 S.W.3d 583, 597 (Tenn. Ct. App. 2012); *accord Ellis v. Ellis*, 621 S.W.3d 700, 708 (Tenn. Ct. App. 2019). Because the trial court did not consider or apply the statutory factors set forth in section 36-5-121(i) as required in making what is clearly a $40,979.89 award of Wife's attorney's fees, it applied an incorrect legal standard. We have determined that under the circumstances presented in this case, such an award is unwarranted.

In the seminal *Gonsewski* case, the Supreme Court considered an award of attorney's fees in a contentious divorce action and stated:

> The trial court declined to make such an award to either party because much of the expense they incurred in litigating the case was due to numerous, unnecessary filings resulting in numerous, unnecessary court hearings. The Court of Appeals reversed and awarded Wife her attorney's fees and expenses, both in the trial court and on appeal, as a form of alimony in solido. In our view, this was error.

350 S.W.3d at 113. The *Gonsewski* Court, observing that "the procedural history of this case militates against an award of attorney's fees and expenses," *id.,* reviewed the voluminous filings, allegations, and litigated arguments between the parties in that case, and stated, "[w]e fully agree with the trial court that each party should bear the expense of his or her litigiousness in what should have been a relatively uncomplicated, routine divorce proceeding." *Id.* at 114.

The procedural history of the present case has similarities to the situation presented to the Supreme Court in *Gonsewski*. The voluminous size of the technical record and the enormous legal bills incurred by both parties attest to their extraordinary litigiousness. As found by the trial court, Wife filed "at least" five petitions for contempt against Husband, none of which were successful. Wife made numerous allegations of abuse against Husband, "including inappropriate contact with the children by Husband and by a young female family member," according to the trial court's findings, which necessitated DCS involvement; but the trial court found that "DCS investigations of the accusations have resulted in no finding of abuse." To provide one example, Wife's response to the GAL's report and proposed parenting plan included, but was not limited to, the following: (1) motion to disqualify the GAL; (2) subpoena to take deposition duces tecum of the GAL; (3) motion to consider child's preference and allow testimony of children; (4) motion to transfer and assign the case to an out-of-county judge; (5) motion to exclude the testimony of Dr. Ciocca, the custodial evaluator; and (6) a separate petition to disqualify the GAL with accompanying memorandum of law, filed after Wife's motion seeking the same result.

For his part, Husband also filed no small number of motions with the trial court. He argues that most of them involved attempts to obtain and exercise visitation with his children. Wife asserts that her litigiousness was motivated by her genuine fears for the safety and welfare of the children. The parties were within their rights to fully and strenuously litigate each issue, but in the absence of circumstances warranting an exception to the application of the American Rule, they should each be responsible for their own attorney's fees. *See, e.g.*, *Coleman v. Coleman*, No. W2011-00585-COA-R3-CV, 2015 WL 479830, at *6 (Tenn. Ct. App. Feb. 4, 2015) (quoting the trial court's observation that each side "can certainly engage in such a strategy" of using "every litigation arrow in his quiver" but "must recognize that [he or] she cannot expect the other side to pay for it"). We modify the trial court's division to provide that the parties shall receive fifty percent of the equity in the marital residence, without deducting the amount of the debt secured by an attorney's lien for fees charged by Wife's first attorney. The effect of our ruling is that each party is responsible for his or her own divorce attorney's fees, with the exception of the $7,500 award of alimony in solido, which the trial court ordered under a proper analysis of the factors in Tenn. Code Ann. § 36-5-121, as will be discussed further below.

Husband argues that Wife's litigation tactics were so unjustified and extreme that they should be held to be a dissipation of the marital estate. The trial court denied this request, and we agree. "Dissipation of assets" is statutorily defined at Tenn. Code Ann. § 36-4-121(5)(B) as "wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed." In *Larson-Ball v. Ball*, 301 S.W.3d 228, 235 (Tenn. 2010), the Court explained the concept of dissipation as follows:

> Whether dissipation has occurred depends on the facts of the particular case. 24 Am.Jur.2d Divorce and Separation § 526 (2009). The party alleging dissipation carries the initial burden of production and the burden of persuasion at trial. *Burden v. Burden*, 250 S.W.3d 899, 919 (Tenn. Ct .App. 2007), *perm. to app. denied*, (Tenn. Feb. 25, 2008). Dissipation of marital property occurs when one spouse wastes marital property and thereby reduces the marital property available for equitable distribution. *See Altman v. Altman*, 181 S.W.3d 676, 681–82 (Tenn. Ct. App .2005), *perm. to app. denied*, (Tenn. Oct. 31, 2005). Dissipation "typically refers to the use of funds after a marriage is irretrievably broken," *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006), is made for a purpose unrelated to the marriage, and is often intended to "hide, deplete, or divert" marital property. *Altman*, 181 S.W.3d at 681-82. In determining whether dissipation has occurred, trial courts must distinguish between dissipation and discretionary spending. *Burden*, 250 S.W.3d at 919–20; 24 Am.Jur.2d Divorce and Separation § 526 (2009). Discretionary spending might be ill-advised, but unlike dissipation, discretionary spending is typical of the parties' expenditures throughout the course of the marriage. *Burden*, 250 S.W.3d at 919-20.

Husband cites no legal authority whereby a Tennessee court has found the expenditure of legal fees incurred in prosecuting or defending a divorce action to be dissipation of marital assets. The sole case cited and relied upon by Husband, *Beyer v. Beyer*, 428 S.W.3d 59, 83 (Tenn. Ct. App. 2013), found dissipation by a husband who paid his former attorney to develop a separate civil action against his spouse for "parental alienation syndrome." This is a different situation from paying a divorce attorney for doing legal work on the actual divorce case, as was the situation here. In this case, the trial court found only that "[t]his litigation has dissipated the marital assets, and each party will have to adjust their standard of living to make ends meet in the future." Because "dissipation" is in some ways a legally defined term of art, it may be more precise to say that the litigation *depleted* the marital estate, which is certainly true. In any event, we decline to hold that Wife dissipated the marital assets by incurring attorney's fees for the divorce action.

Wife argues that the trial court erred in classifying some of the debts incurred by the parties as marital. While the parties were still married but litigating the divorce, they each borrowed money from family members. The trial court found that Wife had debts to her mother and brother totaling $22,300, and Husband had borrowed $163,458.42 from his parents. In dividing the marital estate, the court allocated Wife's $22,300 debt to her, and Husband's $163,458.42 debt to him. Wife argues that each party took the borrowed money and used it to pay attorney's fees. Citing this Court's observation in *Rountree v. Rountree*, 369 S.W.3d 122, 134 (Tenn. Ct, App. 2012) that "[a]ttorney fees incurred by each party are not marital debt," Wife asserts that these debts should not have been classified as marital. The testimony in the record is unclear as to what proportion of the money borrowed went to pay the parties' attorneys. It is well-established that "'marital debts' are all debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing." *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003); *England v. Lowry*, No. E2019-01660-COA-R3-CV, 2020 WL 4355051, at *5 (Tenn. Ct. App. July 29, 2020). In the present case, if the debts were reclassified as separate as Wife requests, nothing would change from a practical financial aspect, because the trial court assigned each party 100% of his or her respective debts. Technically, the division of the marital estate would be much closer to 50/50 if this classification modification happened, as Wife asserts; but neither party would receive a dollar more or less than under the trial court's division as ordered. We find no error in the trial court's classification and allocation of the marital debt.

### B. Award of Transitional Alimony and Alimony in Solido

Husband argues on appeal that the trial court erred in awarding spousal support to Wife, both in the form of $2,500 per month in transitional alimony for five years, and $7,500 of Wife's attorney's fees as alimony in solido. Wife argues that the alimony awards were insufficient and should have been larger. Our standard of review of the trial court's spousal support decision is as stated by the Supreme Court:

> For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support. This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award.

> Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew*, 40 S.W.3d at 470; *Robertson v. Robertson*,

12

76 S.W.3d 337, 340-41 (Tenn. 2002).  As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision."  *Kinard*, 986 S.W.2d at 234.  Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable."  *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006).  Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion.  *Robertson*, 76 S.W.3d at 343.  An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice.  *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010).  This standard does not permit an appellate court to substitute its judgment for that of the trial court, but " 'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.' " *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).  Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision.

*Gonsewski*, 350 S.W.3d at 105-06 (internal citations and footnote omitted).

A trial court's award of spousal support is governed by Tenn. Code Ann. § 36-5-121(i), which provides:

In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

At the time of trial, Husband was 46 years old and Wife was 44. Both were in generally good health. Husband owns and operates a lawn care and landscaping business. The trial court found his average income for the years 2016-2018 was $97,202.94, and that his net income was around $8,300 per month. Wife was working about 32 hours per week at a dental clinic, earning approximately $18.39 an hour. The parties stipulated that her gross monthly income was $2,530.00. Among its extensive findings of fact, the trial court stated as follows, in part pertinent to the section 36-5-121 spousal support analysis:

> The parties have been married for fifteen years but have lived apart for five years. Both parties are mentally and physically fit. They are both capable of increasing their earnings.

> Wife is intelligent, steadily employed, and has the ability to advance in her career over time. Primarily because of the substantial expense of this litigation, Wife has not achieved a comparable lifestyle to her lifestyle while living with Husband. Her current [income] is several thousand dollars [per month] less than Husband's. Wife made significant contributions to the marriage and family[,] allowing Husband to start and develop a lucrative business.

14

The income from Husband's [business] fluctuates throughout the year and on an annual basis. Husband has borne the lion's share of the expense related to this litigation and he has paid child support and marital expenses that benefit Wife for the nearly six years of this litigation.

The Court finds that Wife is economically disadvantaged as compared to Husband and temporarily needs funds to adjust to living post-divorce.

Because of the nature of Husband's business, Husband has the ability to increase his earnings.

The trial court found that the parties' affidavits "anticipated expenses that far exceed what they reasonably will be able to afford considering the[ir] incomes and debts," and "each party will have to adjust their standard of living to make ends meet in the future." The evidence does not preponderate against the trial court's findings of fact.

It is axiomatic that "the two most important factors considered are the need of the disadvantaged spouse and the obligor spouse's ability to pay." *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003); *Gonsewski*, 350 S.W.3d at 110. The trial court determined that Wife had the need for, and Husband the ability to pay, transitional alimony of $2,500 per month for five years, given the disparities in the parties' respective incomes. Husband argues that Wife's large expenditures of time and money in litigation were mostly fruitless and unwarranted attempts to alienate him from the children, pointing to these statements made by Wife as examples of her attitude toward him and the divorce litigation:

Q: Do you take any responsibility for the litigation in this case being dr[agged] out?
A: No.
Q: Do you take any responsibility for any problems whatsoever in the marriage?
A: No, ma'am.

\* \* \*

Q: Do you have any recollections of any positive experiences the children had with their father?
A: I cannot recall any. Possibly when they were a baby in holding them. When we went on vacation, he−it was once a year, and he was usually drinking heavily, so−
Q: And that's a positive experience with the children?

15

A: No, it's not.
Q: My question is . . . do you have any recollections of positive experiences−
A: I do not.
Q:−for the children?
A: I do not.
Q: Zero?
A: Zero.

The trial court found that "Wife has demonstrated throughout the parties' separation that she is not willing to facilitate meaningful parenting time for Husband." The court also said that it considered "the relative fault of the parties," but did not further elaborate.

Husband argues that the trial court should have awarded him attorney's fees rather than Wife. Wife argues that the trial court should have awarded her all of her attorney's fees. As already stated, it is apparent from the record that the trial court properly considered and applied the statutory factors of Tenn. Code Ann. § 36-5-121 in awarding Wife $7,500 of her attorney's fees as alimony in solido. Keeping in mind the deferential standard of review emphasized by the Supreme Court in *Gonsewski*, we decline to hold that the trial court abused its discretion in its spousal support decisions, and we affirm them.

## C. Permanent Parenting Plan

Wife argues that the trial court erred in equally dividing the parenting time between the parties, asserting that Husband's time should have been less. Husband argues that the trial court should have named him the primary residential parent instead of Wife. A trial court's decision regarding a parenting schedule is subject to review under the deferential abuse of discretion standard. *C.W.H. v. L.A.S.*, 538 S.W.3d 488, 495 (Tenn. 2017). As the Supreme Court instructed in *C.W.H.*,

> This Court has previously emphasized the *limited* scope of review to be employed by an appellate court in reviewing a trial court's factual determinations in matters involving child custody and parenting plan developments. *Armbrister* [*v. Armbrister*], 414 S.W.3d [685], 692-93 [(Tenn. 2013]. . . . Indeed, trial courts are in a better position to observe the witnesses and assess their credibility; therefore, trial courts enjoy broad discretion in formulating parenting plans. *Id.* at 693 (citing *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007)). "Thus, determining the details of parenting plans is 'peculiarly within the broad discretion of the trial judge.' " *Id.* (quoting *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)). Appellate courts should not overturn a trial court's decision merely because

reasonable minds could reach a different conclusion. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).

*Id*. (emphasis in original).

A trial court making a custody determination must apply the following analysis proscribed by Tenn. Code Ann. § 36-6-106:

(a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . .

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

The trial court found as follows, in pertinent part:

Wife has performed the majority of parenting responsibilities related to the daily needs of the children; however, the strength, nature, and stability of the

18

children's relationship with Husband have been adversely affected by Wife's attempts to alienate the children from Husband.

Based on past performance and potential for future performance, Husband is more willing to facilitate and encourage the children's relationship with Wife than Wife is willing to facilitate and encourage the children's relationship with Husband. Wife's unwillingness to accept the opinion of professionals and all evidence that Husband has remained sober suggests Wife may continue with efforts to alienate the children from Husband.

*     *     *

Throughout the marriage, Wife has taken the greater responsibility for performing parental responsibilities.

As reflected in the reports from professionals, love, affection, and emotional ties exist between the children and both parents.

Both parents have the ability to meet the emotional and developmental needs of the children provided Wife continues in counseling with a counselor she trusts and accepts the professional advice of the counselor, and Husband refrains from consumption of alcohol and remains in family counseling as recommended by the counselor.

Although Husband has abused alcohol, he has demonstrated his ability to refrain from drinking. The Court finds him morally, physically, mentally, and emotionally fit to parent the children. Wife is a loving mother whose concern regarding Husband's drinking in the past has caused her mental and emotional stress that, according to the professionals in the case, has impacted the children's relationship with Husband.

The children have a close relationship with their adult siblings and with other members of Wife's family. The children also have a close relationship with members of Husband's family.

The children have lived primarily with Wife at their maternal grandparents' home. Though not ideal, Wife's living arrangements have provided a stable environment for the children.

19

Although Wife alleges Husband's behavior was abusive while he was intoxicated, Husband has refrained from drinking (except for one glass of wine in 2017) for over five years.

*  *  *

Both parties are able to adjust their employment schedules to accommodate parenting; however, Husband works longer hours and does not have family members in town who can take care of the children when Husband is not available.

(Numbering in original omitted).

As already noted, the trial court's ordered parenting plan was largely in accordance with the recommendations of Dr. Collins, the children's psychologist; Dr. Ciocca, the forensic psychological custodial evaluator; and GAL Shari Myers. Dr. Ciocca testified that he recommended a parenting schedule balanced between the parties in order to

perhaps neutralize existing trends that were moving in the direction of Father becoming marginalized and possibly alienated. That's the same reason I said that the Court should consider the possibility of appointing Father as the primary residential parent. Despite the fact that both parties could serve that function.

Notwithstanding Dr. Ciocca's rather mild suggestion that the trial court should "consider" naming Husband primary residential parent, the trial court designated Wife in that capacity. The record reflects that when the medical professionals expressed opinions that were contrary to Wife's, she strenuously objected and made every effort to limit the trial court's consideration of them. As found by the trial court,

Because of Husband's drinking to excess for several years of the marriage, Wife distrusts Husband and continues to be concerned, despite the opinion of professionals to the contrary, that Husband is not properly managing his alcoholism.

Wife does not agree with any professionals retained during the pendency of the divorce. She does not trust their motives or their competence to assess the circumstances of the case. Wife believes the professionals all unfairly side with Husband and do not consider her perspective. The Court observed no bias by any of the professionals retained in this case.

20

\* \* \*

Wife does not trust the opinions and recommendations of the GAL, the children's psychologist, or the parental evaluator retained in this case, each of whom recommends reuniting the minor children with Husband for substantial, unsupervised parenting time.

(Numbering in original omitted; paragraphs reorganized).

Wife argues that the evidence preponderates against the trial court's characterization of her behavior as "alienating" the children from Husband, pointing to this testimony of Dr. Ciocca:

[S]ome of these trends that I saw happening in the family, none of which I lay at the feet of the mother as−as a conscious, willful effort, could create down the time line alienation, which once it occurs is very difficult to reverse.

\* \* \*

Q: You, I believe, have expressed the opinion that the mother has not been guilty of an alienating behavior?

A: Not that I could observe.

\* \* \*

Q: It's not even close. Is that what you just said?

A: Yes. It's not even close to alienation because in alienating−in cases of full parental alienation, children don't visit with the other parent. And my concern is that it could end up in that direction and we could end up in a pattern of refusal or− for alienation.

It is evident that the trial court well understood the import of Dr. Ciocca's testimony that Wife "is not intentionally engaging in behaviors that could alienate the children" from the following exchange:

THE COURT: Dr. Ciocca, are you saying that the impact may be that the children, particularly over time, will become alienated, not so far as to be estranged from their father and that not necessarily because the mother is intending to do that, but because over time the children have developed a

21

protective attitude for the mother so that they behave a certain way to comply with what they think she wants them to do?

A: Yes, ma'am. . . That's exactly . . . the viewpoint I've been trying to articulate. And my concern is that over time they could become estranged or alienated. Estrangement is an in between phase. But, yeah, that's exactly what I was— that's exactly what I was trying to communicate, however inartfully.

THE COURT: Okay. And you're not blaming either one of the parents. It's just that this is a consequence of what's happened over time, right?

A: Yes, that's right.

THE COURT: Okay. And the mother may not be aware that this is the impact it has on the children or that she—what she's doing?

A: Correct. Father takes responsibility for his problematic behavior during the dissolution of the marriage. So I'm not saying I blame him, but he needs to take responsibility for that. Mother needs to take responsibility for whatever she was doing in the marriage.

In her arguments to the trial court and this Court, Wife emphatically and repeatedly refers to Husband's history of alcohol abuse, particularly the one glass of wine Husband drank at a Super Bowl party in 2017. Husband admitted that he drank to excess during the marriage. He testified that he stopped drinking when it became apparent that it would become an impediment to gaining custody and visitation with his children. Wife did not dispute that during the divorce litigation, Husband submitted to more than 40 tests for alcohol use, all of which were negative. Many of these were hair follicle tests that were said to reveal any alcohol use for the past 90 days. Husband admitted drinking a glass of wine in 2017, which he reported to the GAL and Dr. Ciocca. The trial court found that Husband, "concerned about being fit to see his children, . . . has been sober since late 2013." The evidence does not preponderate against this finding. The trial court was not persuaded by Wife's argument that Husband's consumption of a glass of wine at the 2017 Super Bowl party was a reasonable ground to restrict Husband's visitation with his children, and neither are we.

The evidence does not preponderate against the findings of fact underpinning the trial court's permanent parenting plan order. The trial court's ruling of equal parenting time for the parties comports with our legislature's directive to "order a custody arrangement that permits both parents to enjoy the maximum participation possible in the

life of the child[ren]" as warranted by the factual circumstances of the case.  Tenn. Code Ann. § 36-6-106(a).  The judgment regarding the permanent parenting plan is affirmed.

### D. Attempt to Disqualify GAL and Payment of GAL Fees

Wife filed both a motion and a petition to disqualify the GAL after the GAL filed a proposed parenting plan recommending equal time for the parties and designating Husband primary residential parent.  Both Husband and the GAL opposed the motion, and as stated, the hearing took three days of court to resolve.  Wife argues on appeal that the GAL should have been disqualified because she entered into a bartering agreement with Husband without first seeking approval from the trial court or from Wife.  The GAL questioned the timing of Wife's challenge to her, pointing out that by her own admissions in her pleadings, Wife had known about the bartering arrangement for nearly a year before she filed her motion to disqualify, but only filed it after the GAL filed the proposed parenting plan.

The trial court, after hearing and considering Wife's arguments at length, held that there was no legal authority that required Husband to seek approval or notify the court or Wife of the bartering arrangement beforehand.  The trial court ultimately found that

> [t]he arrangement Husband had with the GAL helped to preserve assets of the marital estate and substantially reduced the amount the parties still owe for the GAL's services.  The bartering arrangement benefitted both parties and should not be counted to increase or decrease the income of either party.

Our review of the record reveals that the trial court correctly declined to disqualify the GAL because Wife did not demonstrate any legal ground for doing so.  The GAL was not made a material witness in the case as Wife argued, nor is there any proof in the record that she acted improperly in her role as impartial advocate for the best interests of the children.

Husband argues on appeal that the trial court erred in ordering him to pay the majority of the GAL fees, which totaled approximately $116,000.  Wife argues that the trial court erred by ordering the parties to evenly split the responsibility for paying the outstanding balance owed the GAL at the end of the trial, which appears to be approximately $37,382.92.  "In awarding guardian ad litem fees in a custody case, the trial court is given wide discretion, and this court will not interfere in the exercise of that discretion absent a clear showing of abuse."  *Keisling v. Keisling*, 196 S.W.3d 703, 726 (Tenn. Ct. App. 2005).  Husband argues that the GAL fees for litigating Wife's ultimately groundless motion to disqualify her amounted to around $20,000, and he should not be forced to pay for that meritless and vexatious quest.  He makes some valid points in this regard, and the record bears out the trial court's observation that "Husband has borne the lion's share of the expense related to this litigation."  On the other hand, his significantly

higher income places him in a better position than Wife to be able to pay these costs. We do not find the trial court abused its "wide discretion" in its award of GAL fees.

## E. Calculation of Husband's Income

Wife argues that the trial court erred in calculating Husband's income to be $8,659 per month. She claims it should be higher because of her allegation that Husband's federal income tax returns show that he has claimed an unknown amount of depreciation as an expense of his landscaping business. We are not persuaded. Husband presented substantial evidence of his income to the trial court, including the testimony of his accountant, who explained at length the accounting of his tax calculations, apparently to the satisfaction of the trial court. The evidence does not preponderate against the trial court's finding of fact regarding Husband's monthly income.

## F. Attorney's Fees Incurred on Appeal

Finally, Wife asserts that she is entitled to attorney's fees on appeal. This decision is soundly within the discretion of this Court. *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). "When considering a request for attorney's fees on appeal, we also consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the requesting party sought the appeal in good faith, and any other equitable factors relevant in a given case." *Chaffin v. Ellis*, 211 S.W.3d 264, 294 (Tenn. Ct. App. 2006) (citing *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005)). Under all of the circumstances of this case, we respectfully decline to award Wife her attorney's fees incurred on appeal.

## V. CONCLUSION

The judgment of the trial court is modified to correct the clerical error that counted Wife's retirement account twice, and to reflect that Wife shall be responsible for the debt for her first attorney's fees. The judgment of the trial court is affirmed in all other respects. Costs on appeal are assessed one-half to the appellant, Richard E. Davis, Jr., and one-half to the appellee, Kacy Collums Davis, for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE